UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LISA MARIE CHAMPION,  Civil Action No.: 16-12924
                     Honorable Arthur J. Tarnow
       Plaintiff,    Magistrate Judge Elizabeth A. Stafford

v.

NANCY A. BERRYHILL,
ACTING COMMISSIONER
OF SOCIAL SECURITY,

       Defendant.

_____/

# REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [ECF. NOS. 17, 21]

Plaintiff Lisa Marie Champion appeals a final decision of defendant Commissioner of Social Security (Commissioner) denying her application for disability insurance benefits (DIB) under the Social Security Act. Both parties have filed summary judgment motions, referred to this Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). After review of the record, the Court finds that the administrative law judge's (ALJ) decision violated the treating physician rule and thus **RECOMMENDS** that:

- Champion's motion [ECF No. 17] be **GRANTED**;
- the Commissioner's motion [ECF No. 21] be **DENIED**; and

- the matter be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this report and recommendation.

I.  **BACKGROUND**

A.  **Champion's Background and Disability Applications**

Born December 29, 1967, Champion was 45 years old when she submitted her application for disability benefits in September 2013.  [ECF No. 11-2, Tr. 38; ECF No. 11-5, Tr. 143].  She received her GED and nursing assistant training from the American Red Cross.  [ECF No. 11-2, Tr. 39-40].  Champion's past relevant work was classified as a receptionist and sorter/gauger.  [ECF No. 11-2, Tr. 60].  Champion alleges a disability onset date of September 1, 2011. [ECF No. 11-2, Tr. 35; ECF No. 7-3, Tr. 75].  Her last insured was December 31, 2014.  [ECF No. 7-2, Tr. 14].

After a hearing on May 6, 2015, during which Champion and a vocational expert (VE) testified, the ALJ found that Champion was not disabled.  [ECF No. 11-2, Tr. 17-27, 32-81].  The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  [*Id.*, Tr. 1-3].  Champion timely filed for judicial review.  [ECF No. 1].

**B. The ALJ's Application of the Disability Framework Analysis**

DIB is available for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). A "disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Commissioner determines whether an applicant is disabled by analyzing five sequential steps. First, if the applicant is "doing substantial gainful activity," he or she will be found not disabled. 20 C.F.R. § 404.1520(a)(4). Second, if the claimant has not had a severe impairment or a combination of such impairments[1] for a continuous period of at least 12 months, no disability will be found. *Id.* Third, if the claimant's severe impairments meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, the claimant will be found disabled. *Id.* If the fourth step is reached, the Commissioner considers its assessment of the claimant's residual functional capacity ("RFC"), and will find the claimant not disabled if he or she can still do past relevant work.

---

[1] A severe impairment is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities." § 1520(c).

*Id.* At the final step, the Commissioner reviews the claimant's RFC, age, education and work experiences, and determines whether the claimant could adjust to other work. *Id.* The claimant bears the burden of proof throughout the first four steps, but the burden shifts to the Commissioner if the fifth step is reached. *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Applying this framework, the ALJ concluded that Champion was not disabled. At the first step, she found that Champion had not engaged in substantial gainful activity during the relevant period. [ECF No.11-2, Tr. 19]. At the second step, she found that Champion had the severe impairments of "history of traumatic brain injury with left temporal fracture, hearing loss on the right side, multi-level disc bulges of the lumbar spine status post anterior lumbar interbody fusion and instrumentation resulting in chronic pain and post laminectomy syndrome." [*Id.*]. Next, the ALJ concluded that none of her impairments, either alone or in combination, met or medically equaled the severity of a listed impairment. [*Id.*, Tr. 18].

Between the third and fourth steps, the ALJ found that Champion had

the RFC to perform sedentary work[2] as defined in 20 C.F.R. § 404.1567(a), except that:

> [S]he could only occasionally climb stairs, crouch, crawl, kneel, stoop or bend; should avoid workplace hazards, such as moving machinery, unprotected heights and, as such, should not climb ladders, ropes, or scaffolding; is limited to work that is low stress which does not require any complex decisions but, rather, involves only simple decisions; and, needs a job which allows for the opportunity to alternate between sitting and standing while engaging in the work, as desired.

[ECF No. 11-2, Tr. 22]. At step four, the ALJ found that Champion was capable of performing her past relevant work as a reception and sorter/gauger. [*Id.*, Tr. 26]. This rendered a finding that Champion was not disabled during the relevant period. [*Id.*, Tr. 27].

## II.    ANALYSIS

Pursuant to § 405(g), this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made in conformity with proper legal standards. *Gentry v. Comm'r*

---

[2]"In order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8–hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2–hour intervals. If an individual is unable to sit for a total of 6 hours in an 8–hour work day, the unskilled sedentary occupational base will be eroded. The extent of the limitation should be considered in determining whether the individual has the ability to make an adjustment to other work." Social Security Ruling (SSR) 96-9p, 1996 WL 374185 (1996),

5

of Soc. Sec., 741 F.3d 708, 722 (6th Cir. 2014). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks and citation omitted). Only the evidence in the record below may be considered when determining whether the ALJ's decision is supported by substantial evidence. *Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007).

Champion argues that the ALJ failed to provide good reasons for not giving controlling weight to the RFC assessed by Jason Peter, D.O., due to her musculoskeletal impairments, and by assessing her credibility. The Court agrees that the ALJ violated the treating physician rule, requiring remand, which will necessarily require a reassessment of Champion's credibility.

## A.

Champion's musculoskeletal impairments are well documented. In May 2011, Pramod Kerkar, M.D., of the Pain Clinic of Sterling Heights examined her, noting her previous MRI showing a disc bulge at L3-L4, disc ossified complex and L4-L5, degenerative disc disease, and facet joint hypertrophy at the lumbar spine. [ECF No. 11-7, Tr. 305]. The skeletal

6

examination revealed diffuse lumbar paraspinal tenderness, increased pain with extension and rotation, tenderness over the sacroiliac joint, positive straight leg raising tests on the right from both the sitting and supine positions, and diminished sensation and light touch in the right lower extremity. Dr. Kerkar diagnosed Champion with right lumbar radiculopathy and lumbar facet hypertrophy/spondylosis. [*Id.*, Tr. 308]. He prescribed fentanyl and oxycodone, and indicated that surgery would be considered depending on her response to therapeutic injections. [*Id.*, Tr. 309].

The following month, Champion returned to this clinic and was seen this time by Dr. Peter, whose findings were the same as Dr. Kerkar's. [*Id.*, Tr. 311-12]. He continued her on fentanyl, increased her dosage of oxycodone, and again noted that a surgical evaluation may be warranted. [*Id.*, Tr. 313]. Dr. Kerkar saw Champion again in July 2011, and indicated that she would follow up with another doctor to consider surgical intervention. [*Id.,* Tr. 314-16]. In August 2011, Dr. Kerkar concluded that conservative measures had failed and noted that Champion had seen Andres Munk, M.D., for possible surgical interventions. [*Id.*, Tr. 317-19].

Dr. Munk performed a spinal fusion from L3-L5 in September 2011, but Champion was still having severe intractable pain and severe spasms when she saw Rakesh Vakhariya, D.O., (at the same Sterling Heights pain

7

clinic) in October 2011. [*Id.*, Tr. 320]. She remained in severe pain when she saw Dr. Kerkar later in October 2011. [*Id.*, 323-324]. Dr. Kerkar reported in November 2011 that her radicular pain had improved by November 2011, but she continued to have a fair amount of discomfort and lower spine spasms, and her lumbar range of motion was reduced by 50%. [*Id.*, Tr. 326-27]. Champion remained on a fentanyl patch and she was instructed to take oxycodone six times a day. [*Id.*, Tr. 328].

Dr. Vakhariya described Champion's lower back pain as "quite severe" in December 2011 despite her fentanyl patch and the oxycodone. [ECF No. 11-2, Tr. 329]. He noted paravertebral muscle spasm from L3-S1, increased pain with loading of the lumbar facet joints, continuing limitation in her range of motion in the lumbar spine, and continuing decreased sensation in the right lower extremity. [*Id.*, Tr. 330]. Dr. Vakhariya diagnosed Champion with right lumbar radiculopathy improved with surgery, lumbar facet pain, spondylosis, hypertrophy, acute back pain, and spasm. [*Id.*]. A December 2011 MRI revealed disc bulges at L4-L5 and L5-S1 levels impinging upon the thecal sac and causing mild bilateral neuroforaminal compromise, and disc bulge impinging upon the thecal sac at the L3-L4 level. [*Id.*, Tr. 279].

Champion's contention that she suffers severe symptoms despite the surgery is supported by her surgeon's reports following the surgery. Dr. Munk reported in February 2012 that she was "still having quite a bit of pain"; in April 2012 that she was "not during very well"; in October 2012 that she had "persistent lower back pain" and "chronic right lower extremity numbness and tingling"; and in October 2013, she was "not really doing that well." [*Id.*, Tr. 367, 372-375].

From January 2012 to May 2014, Dr. Peter saw Champion eleven times. In January 2012, he performed a therapeutic injection. [ECF No. 11-7, Tr. 357-58]. The procedure was performed because Champion was suffering from "chronic intractable pain" that had not responded to oral medication or physical therapy. [*Id.*, Tr. 357]. Dr. Peter stated that multiple attempts at conservative treatment had failed to relieve her pain, which was associated with diagnoses of lumbar radiculopathy, lumbar facet joint disease, degenerative disc disease, disc herniation and facet hypertrophy. [*Id.*]. Dr. Peter performed another injection in March 2012, and again noted the failure of conservative treatments. [*Id.*, Tr. 355].

When Dr. Peter saw Champion in October 2012, his examination revealed bogginess and spasm on both sides of the lumbar spine, and tenderness from L2 to L5 upon palpation; decreased lumbar lordosis; a

9

range of motion in all planes of the spine that was decreased by 50%; positive straight leg raising and axial compression tests; and diminished sensation. [*Id.*, Tr. 363-66]. To relieve her symptoms, she was using oxycodone, fentanyl and diazepam (Valium). [*Id.*, Tr. 363]. In November 2012, Dr. Peter reported that Champion continued to have pain, muscle spasms and that her range of motion was reduced by 75%. [*Id.*, Tr. 332-34]. Champion still had severe lower back pain radiating into her lower extremity, and Dr. Peter's findings were consistent with prior examinations when he examined her in December 2012, June 2013, January 2014, twice in March 2014, and in May 2014. [ECF No. 11-7, Tr. 296-98, 359-62, 420-31].

A nurse practitioner examined Champion at the Sterling Heights clinic in July, August and November 2014, and Dr. Peter signed her reports as the "collaborating physician." [*Id.*, Tr. 405-07, 414-19]. Champion continued to have a decreased lumbar lordosis, pain upon spinal palpation, significantly decreased range of motion in the spine, positive straight leg raising tests and decreased sensation. [*Id.*].

Dr. Peter completed an RFC questionnaire in April 2015, identifying Champion's diagnoses as lumbago, radiculopathy, disc degeneration, myelopathy and spondylosis. [*Id.*, Tr. 460]. After identifying symptoms,

10

findings and objective signs that are reflected in his reports, and denying that Champion was a malinger or that her symptoms were caused by emotional factors, Dr. Peter opined that pain constantly interfered with her attention and concentration; she was incapable of even low stress jobs; she could walk half a block; she could sit or stand for 20 minutes at a time; she could sit, stand and walk for less than 2 hours in a workday; she needed periods of walking every 20 to 30 minutes, and to shift positions from sitting, standing or walking at will; she would need unscheduled breaks; she could rarely lift less than 10 pounds and never more; she could occasionally look down, turn her head, look up, and hold her head in a static position; she could rarely twist, stoop or crouch and never climb ladders or stairs; she has good and bad days, and would miss two to three days of work per month; and she must avoid temperature extremes, fumes and gases. [*Id.*, Tr. 460-63].

The "treating physician rule" requires an ALJ to give controlling weight to a treating physician's opinions regarding the nature and severity of a claimant's condition when those opinions are well-supported by medically acceptable clinical and diagnostic evidence, and not inconsistent with other substantial evidence. *Gentry*, 741 F.3d at 723, 727-29; *Rogers*, 486 F.3d at 242-43. "Even when not controlling, however, the ALJ must

consider certain factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability of the physician's conclusions; the specialization of the physician; and any other relevant factors," and give appropriate weight to the opinion. *Gentry*, 741 F.3d at 723. In all cases, a treating physician's opinion is entitled to great deference. *Id.*

An ALJ who decides to give less than controlling weight to a treating physician's opinion must give "good reasons" for doing so, in order to "make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *5 (1996)). This procedural safeguard not only permits "meaningful appellate review," but also ensures that claimants "understand the disposition of their cases." *Rogers*, 486 F.2d at 242-43 (internal quotation marks and citation omitted). Courts will not hesitate to remand when the ALJ failed to articulate "good reasons" for not fully crediting the treating physician's opinion. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004).

Here, after describing Dr. Peter's opinion, the ALJ found that it was speculative as to the number of days that Champion would miss per month, but that her "limitations for sedentary work are well supported by her

12

lumbago, radiculopathy, disc degeneration, myelopathy, and spondylosis together with pain in her low back, which radiates into her right lower extremity." [ECF No. 11-2, Tr. 25-26]. The ALJ found that Dr. Peter's opinion for sedentary work was also consistent with other treatment records from October 2011 to August 2012. [*Id.*, Tr. 26]. Yet she did not give Dr. Peter's opinion controlling weight. Instead, she concluded, "[T]he undersigned assigns some weight to Dr. Peter's opinion to the extent it is consistent with the undersigned's sedentary residual functional capacity with the opportunity to alternate between sitting and standing while engaged in the work." [*Id.*]. Champion argues that this reasoning is insufficient. The Court agrees.

## B.

The Commissioner argues as an initial matter that Dr. Peter was not a "treating physician." This argument is without merit. "A physician qualifies as a treating source if the claimant sees her 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'" *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir.2007) (alteration in original) (quoting 20 C.F.R. § 404.1502). As described above, Dr. Peter examined and treated Champion eleven times from 2011 through 2014, and was the collaborating

physician when a nurse practitioner at his clinic examined Champion three more times in 2014. The Sixth Circuit has considered three or fewer examinations to be insufficient to establish treating physician status. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007) (opinion of doctor who treated three times was not entitled to controlling weight); *Kornecky v. Comm'r of Soc. Sec.,* 167 F. App'x 496, 506, n.10 (6th Cir. 2006) ("Indeed, depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship."). But the Commissioner cites no authority to support a finding that a physician who has seen a patient as often as Dr. Peter saw Champion is not entitled to treating status.

The Court agrees with Champion that Dr. Peter's treatment of her provided him with the type of detailed, longitudinal and unique picture of her impairment to which the treating physician rule is supposed to apply. This is true especially because Champion was examined and treated by other physicians in Dr. Peter's clinic (Dr. Vakhariya and Dr. Kerkar), and he was thus privy to their records. It is furthermore noteworthy that Dr. Munk and Dr. Vakhariya described Champion as Dr. Peter's patient, and even the ALJ called Dr. Peter Champion's pain doctor. [ECF No. 11-2, Tr. 25; ECF No. 11-7, Tr. 320, 372, 375].

14

The Commissioner's argument that the ALJ provided good reasons for giving Dr. Peter's opinion only some weight is equally unsustainable. The ALJ found the Dr. Peter's opinion was supported at least in part both by his own treatment records and by other evidence in the record, and then without any explanation said that she was therefore giving Dr. Peter's opinion "some weight." [ECF No. 11-2, Tr. 26]. Absent good reasons, the ALJ was required to give Dr. Peter's opinion about to the nature and severity of Champion's impairment full, controlling weight. *Gentry*, 741 F.3d at 723, 727-29; *Rogers*, 486 F.3d at 242-43.

The Commissioner argues that the ALJ was entitled to give controlling weight to only the part of Dr. Peter's opinion that she found well-supported by the record. Asserting that the ALJ gave good reasons for finding that not all of Dr. Peter's opinion was well-supported, the Commissioner states that Champion "seems to overlook a large section of the ALJ's decision," and cites to two pages of the ALJ's decision. [ECF No. 21, PageID 570, citing ECF No. 11-2, Tr. 25-26]. But the Commissioner does not specify any part of the "large section of the ALJ's decision" in which good reasons for discounting Dr. Peter's opinion were articulated. The law is clear that the ALJ must articulate good reasons so that

claimants can understand the disposition of their cases, and so that there can be meaningful review. *Rogers*, 486 F.2d at 242-43.

And it cannot be said that the ALJ's error is harmless. A court may find a violation of the treating physician rule harmless if:

> (1) a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) where the Commissioner has met the goal of § 1527(d)(2)—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation.

*Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) (citation and internal quotation marks omitted). The third circumstance is met when the ALJ indirectly attacks the supportability of the treating physician's opinion. *Id*.

Here, Dr. Peter's opinion cannot be considered patently deficient when the ALJ deemed at least part of it well supported by his own records and other evidence in the record, and did not identify any portions of Dr. Peter's opinion that were inconsistent with the record. The ALJ did not adopt Dr. Peter's opinion, as her assessment of Champion's RFC is inconsistent with Dr. Peter's in important respects, including Champion's ability to sit for more than two hours, lift ten pounds, and work in even a low stress environment, and because the ALJ imposed no limitation on her

16

ability to move her neck and head.[3] And while the Commissioner appears to be arguing that the ALJ indirectly attacked portions of Dr. Peter's opinion, she did not make that case; the Commissioner simply referred to two pages of the ALJ's decision and asserted that good reasons were contained therein.

Because the ALJ did not provide good reasons for not fully crediting Dr. Peter's opinion and the error was not harmless, the Court should not hesitate to order a remand. *Wilson,* 378 F.3d at 545.

## III. CONCLUSION

For the reasons stated above, the Court **RECOMMENDS** that Champion's motion [ECF No. 17] be **GRANTED**; that the Commissioner's motion [ECF No. 21] be **DENIED**; and that this matter be REMANDED for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

                                                           s/Elizabeth A. Stafford
                                                           ELIZABETH A. STAFFORD
Dated: August 4, 2017                              United States Magistrate Judge

---

[3] However, the ALJ was not required to give controlling weight to Dr. Peter's opinion that Champion would miss days of work. *Schacht v. Colvin*, No. CV 15-10251, 2016 WL 2733140, at *5 (E.D. Mich. May 5, 2016), *adopted* 2016 WL 5219540 (E.D. Mich. Sept. 22, 2016) (doctor's opinion that claimant would miss several days per week was not a valid medical opinion.); *Kolar v. Comm'r of Soc. Sec.,* No. 1:14–cv–503, 2015 WL 5589265, at *6 (W.D.Mich. Sept. 4, 2015) (a doctor's "predictions of how often plaintiff would likely miss work [is] conjecture, not a medical opinion.").

## **NOTICE TO THE PARTIES REGARDING OBJECTIONS**

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). A copy of any objection must be served upon this Magistrate Judge. E.D. Mich. LR 72.1(d)(2).

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this Report and Recommendation to which it pertains. Not later than fourteen days after service of objections, **the non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc. The response must be **concise and proportionate in**

**length and complexity to the objections**, but there is otherwise no page limitation. If the Court determines that any objections are without merit, it may rule without awaiting the response.

### CERTIFICATE OF SERVICE

      The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 4, 2017.

                                    s/Marlena Williams
                                    MARLENA WILLIAMS
                                    Case Manager